# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MANUEL ALEJANDRO BARRIOS,

      Petitioner,

v.

T. CISNEROS,

      Respondent.

Case No. 5:21-cv-02031-SB-LAL

ORDER ADOPTING REPORT
AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636, the Court has reviewed the petition, Dkt. No. 1, the records on file, and the Report and Recommendation (R&R) of the United States Magistrate Judge, Dkt. No. 12. No objections were filed.

IT IS HEREBY ORDERED that:

1. The Court accepts and adopts the Magistrate Judge's R&R.

2. Judgment shall be entered denying and dismissing the Petition with prejudice.

3. The Clerk serve copies of this Order, the Magistrate Judge's R&R and the Judgment herein on Petitioner and on all counsel of record.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: May 10, 2023

_____
Stanley Blumenfeld, Jr.
United States District Judge

cc: LAL Chambers

FILED
CLERK, U.S. DISTRICT COURT

03/20/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____TRB_____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MANUEL ALEJANDRO BARRIOS,

                    Petitioner,

       v.

T. CISNEROS,

                    Respondent.

Case No. ED CV 21-02031-SB(LAL)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This Report and Recommendation is submitted to the Honorable Stanley Blumenfeld, Jr., United States District Judge, under the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

**I.**

**<u>PROCEEDINGS</u>**

On November 29, 2021, Manuel Alejandro Barrios ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254, with an attachment detailing his claims ("Pet. Att.") and exhibits. On March 2, 2022, Respondent filed an Answer with an attached memorandum ("Ans. Memo"). On April 14, 2022, Petitioner filed a Traverse with an attached memorandum ("Trav. Memo"). Thus, this matter is ready for decision.

///

## **PROCEDURAL HISTORY**

On September 21, 2017, a San Bernardino County Superior Court ("Superior Court") jury found Petitioner guilty of the second degree murder[1] of Anthony Fuentes. (Volume 2 Clerk's Transcript ("CT") at 230, 232; Volume 2 Reporter's Transcript ("RT") at 452-B.) The jury found true the allegation that Petitioner personally used a deadly or dangerous weapon (a knife) in murdering Fuentes.[2] (2 CT at 231-32; 2 RT at 452-B.) On October 20, 2017, the Superior Court sentenced Petitioner to 16 years to life in state prison. (2 CT at 249-52; 2 RT at 460.)

Petitioner appealed his conviction to the California Court of Appeal raising three claims (which Petitioner raises as Claims Four, Eight and Nine in this case). (Lodgments 3-5.) On July 3, 2019, the California Court of Appeal affirmed the judgment in a reasoned decision. (Lodgment 6.) Petitioner then filed a petition for review in the California Supreme Court. (Lodgment 7.) On October 9, 2019, the California Supreme Court granted review pending consideration of a related issue in <u>People v. Frahs</u>.[3] (Lodgment 8.) On August 6, 2020, the California Supreme Court dismissed review. (Lodgment 9.)

On December 16, 2020, Petitioner filed a state habeas petition with the Superior Court raising seven claims (which Petitioner raises as Claims One through Seven in this case). (Lodgment 10.) The Superior Court denied that petition in a reasoned decision dated January 28, 2021, finding that all of Petitioner's claims were procedurally barred except his ineffective assistance of counsel claims. (Lodgment 11 at 1-2.) The Superior Court also denied Petitioner's claims on the merits. (Lodgment 11.) Petitioner then filed a state habeas petition with the California Court of Appeal. (Lodgment 12.) The California Court of Appeal denied that petition without comment on June 14, 2021. (Lodgment 13.) Petitioner then filed a state habeas petition with the California Supreme Court. (Lodgment 14.) The California Supreme Court denied that petition without comment on October 13, 2021. (Lodgment 15.)

---

[1] <u>Cal. Penal Code §§ 187(a)</u>, <u>189</u>.

[2] <u>Cal. Penal Code § 12022(b)(1)</u>.

[3] <u>9 Cal. 5th 618</u> (2020) (finding mental health diversion statute (<u>Cal. Penal Code § 1001.36</u>) applies retroactively).

## III.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Because Petitioner challenges the sufficiency of the evidence, this Court has independently reviewed the state court record.[4] Based on this review, this Court adopts the factual discussion of the California Court of Appeal's opinion in this case as a fair and accurate summary of the evidence presented at trial:[5]

> On March 19, 2014, around 5:30 p.m., Anthony Fuentes paced outside Muscoy Liquor Store, panhandling for change. Fuentes suffered from a mental illness and had spent time in Patton State Hospital (Patton). Surveillance video taken from the liquor store shows [Petitioner] entering the store with his dog while Fuentes is outside the store panhandling. [Petitioner] then exits the store and talks with Fuentes in front of the store for a while. About 35 minutes later, [Petitioner] is shown in the video outside the store making a call. After the call, Fuentes walks away from the store with [Petitioner] and his dog accompanying Fuentes.
>
> [Petitioner's] girlfriend testified that, at around 6:00 p.m., she received a call from [Petitioner] asking for the telephone number for the sheriff's department. [Petitioner] told her a friend needed help. At 6:18 p.m. she texted [Petitioner] with the requested information.
>
> During the recording of [Petitioner's] call to the sheriff's department at 6:27 p.m., [Petitioner] stated there was a man next to him who was "going to go hostile any moment" and might be under the influence of drugs. [Petitioner] is heard during the call telling Fuentes he was going to get him help. [Petitioner]

---

[4] See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

[5] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2254(e)(1)). Thus, Ninth Circuit cases have presumed correct the factual summary set forth in an opinion of the California Court of Appeal under 28 U.S.C. §2254(e)(1). See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (citations omitted).

3

advised the dispatcher that Fuentes needs help; "It's bad"; Fuentes could get violent.  [Petitioner] asked the dispatcher to send someone as soon as possible.

Shortly thereafter, an eyewitness who was in his car stopped at a nearby intersection, saw [Petitioner] and Fuentes fighting in the middle of the street.  [Petitioner] had a dog.  [Petitioner] was arguing with Fuentes and pushing him towards a field.  Fuentes was trying to defend himself as [Petitioner] pushed him into the field.  The eyewitness then saw Fuentes on the ground while [Petitioner] stabbed Fuentes multiple times in the chest and head.  The eyewitness ran over to stop [Petitioner].

Meanwhile, a second eyewitness saw the fight while getting gas across the street.  The second eyewitness saw [Petitioner's] dog attack Fuentes, grabbed a knife, ran over to the dog, and stabbed the dog when it latched onto his foot.

At 6:49 p.m., 911 received a call from [Petitioner's] cell phone, during which [Petitioner] and Fuentes could be heard speaking to each other.  Fuentes said, "F— off.  What are you going to do?" [Petitioner] responded, "I got you out here, motherf—er.  I got you now."  Fuentes said, "No, what you doing motherf—er, what you doing?"  [Petitioner] told Fuentes, "F— that!  You better get the f— back, motherf—er. . . . Don't make me crazy again, bitch.  Don't make me crazy.  I'll f—ing slice your ass up, homie."  Fuentes sounds as if he is hurt and says, "oh, no, no, oh."  [Petitioner] tells Fuentes twice, "I f—ing kicked your ass or what?!"  A third person can be heard saying, "Leave him alone." At the end of the call, [Petitioner] stated, "This motherf—er . . . comes at me all crazy . . . ."

At 6:53 p.m., 911 received a call from someone reporting seeing a lot of men fighting.  The caller said there were initially two men and a dog, and then three more men joined in.  One of the men ([Petitioner]) had a knife.  The other man looked drunk and had a stick.  The caller said it looked like [Petitioner] stabbed a man while the man was on the ground.

4

There were numerous people at the scene when the first officer arrived. Fuentes was on the ground bleeding and appeared to have been stabbed multiple times, including sustaining fatal stabs to his heart, lung, and liver. [Petitioner] admitted he had stabbed Fuentes. There was a knife and a wooden stake on the ground near [Petitioner]. [Petitioner] admitted that the knife was his and that he had used it to stab Fuentes.

After waiving his <u>Miranda</u>[6] rights, [Petitioner] told a detective that, while walking his dog, he stopped at the liquor store to buy beer. [Petitioner] saw Fuentes, whom [Petitioner] knew from high school, panhandling. When Fuentes asked for change, [Petitioner] told him he did not have any. [Petitioner] tied up his dog and went inside the liquor store to buy beer.

After purchasing beer, [Petitioner] sat by Fuentes, drank beer, gave Fuentes a beer, drank another beer, and talked with Fuentes. Fuentes became belligerent and started saying strange things that were threatening. [Petitioner] thought Fuentes was on drugs and was trying to get money for his next fix. Fuentes tried reaching into [Petitioner's] pocket. [Petitioner] suggested Fuentes go to the hospital or a treatment facility. Fuentes did not like this suggestion and suddenly stood up.

When [Petitioner] called his girlfriend and asked her for the number for the sheriff's department, Fuentes became belligerent. [Petitioner] called the sheriff's department and asked the dispatcher to have someone pick up Fuentes because of his threatening behavior. When Fuentes heard this, he became angry, "flipped out," and tried to get away from [Petitioner]. [Petitioner] followed Fuentes across the street. [Petitioner] remained on the cell phone with the sheriff's department so that law enforcement would know where to pick up Fuentes. [Petitioner's] dog was tied around his waist.

---

[6] <u>Miranda v. Arizona</u>, <u>384 U.S. 436</u>, <u>86 S. Ct. 1602</u>, <u>16 L. Ed. 2d 694</u> (1966).

1     Fuentes grabbed two large rocks from the field by the street and threw one

2     of the rocks at [Petitioner], hitting him in the face.  [Petitioner] grabbed a stick

3     and hit Fuentes on the knee.  At one point, [Petitioner] and Fuentes were arguing

4     in the street.  [Petitioner] said his memory was blurry as to where they were.

5     [Petitioner] believed they went to the field, moved to the street, and then moved

6     back to the field, where Fuentes grabbed the stick and stabbed [Petitioner] in the

7     back.  [Petitioner] then grabbed his knife and fatally stabbed Fuentes in the back

8     multiple times, including in the heart, lung, and liver.

9     (Lodgment 6 at 2-6.)

10                                     **IV.**

11                         **PETITIONER'S CLAIMS**

12    Petitioner raises the following claims for habeas corpus relief:

13    (1) Petitioner's trial and appellate counsel were ineffective (Claim One);

14    (2) The prosecution did not present sufficient evidence to support Petitioner's murder

15         conviction (Claims Two and Five);

16    (3) The prosecution misstated material facts to the jury (Claim Three);

17    (4) The prosecution failed to disclose exculpatory Brady[7] evidence (Claim Four);

18    (5) Cumulative error denied Petitioner a fair trial (Claim Six);

19    (6) The police violated Petitioner's Miranda rights (Claim Seven);

20    (7) The Superior Court refused to instruct the jury about the lesser included offense of

21         involuntary manslaughter (Claim Eight); and

22    (8) The state courts' failure to apply to Petitioner's case a newly enacted (and

23         retroactively applied) California law providing for pretrial mental health diversion

24         hearings violated due process, equal protection, and ex post facto principles (Claim

25         Nine).

26    (Petition at 5-8; Pet. Att. at 1-49.)

27

28    ---

[7] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

# V.

## STANDARD OF REVIEW

**A.     28 U.S.C. § 2254**

The standard of review that applies to Petitioner's claims is stated in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  If these standards are difficult to meet, it is because they were meant to be. As the United States Supreme Court stated in Harrington v. Richter,[8] while the AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings[,]" habeas relief may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with United States Supreme Court precedent.  Further, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence.[9]

**B.     Sources of "Clearly Established Federal Law"**

According to Williams v. Taylor,[10] the law that controls federal habeas review of state court decisions under the AEDPA consists of holdings (as opposed to dicta) of Supreme Court

---

[8] 562 U.S. 86, 102, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

[9] 28 U.S.C. § 2254(e)(1).

[10] 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

decisions "as of the time of the relevant state-court decision."  To determine what, if any, "clearly established" United States Supreme Court law exists, a federal habeas court also may examine decisions other than those of the United States Supreme Court.[11]  Ninth Circuit cases "may be persuasive."[12]  A state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court decision has provided a clear holding relating to the legal issue the habeas petitioner raised in state court.[13]

Although a particular state court decision may be both "contrary to" and an "unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings under Williams.

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts.[14]  If a state court decision denying a claim is "contrary to" controlling Supreme Court precedent, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)."[15]  However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."[16]

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts.'"[17]

[11] Deck v. Jenkins, 814 F.3d 954, 978 n.3 (9th Cir. 2016) (citing Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999)); LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000).

[12] Duhaime, 200 F.3d at 600.

[13] Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law."); see also Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

[14] Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing Williams, 529 U.S. at 405-06); Anderson v. Gipson, 902 F.3d 1126, 1132 (9th Cir. 2018).

[15] Williams, 529 U.S. at 406.

[16] Early, 537 U.S. at 8.

[17] Id. at 11 (citing 28 U.S.C. § 2254(d)).

8

Accordingly, this Court may reject a state court decision that correctly identified the applicable federal rule but unreasonably applied the rule to the facts of a particular case.[18] However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable."[19] An "unreasonable application" is different from merely an incorrect one.[20]

Petitioner raised three of his claims with both the California Court of Appeal and California Supreme Court on direct review, and the California Supreme Court denied review without comment. (Lodgments 3-9.) The California Supreme Court's "silent" denial of those claims is considered as being "on the merits" and to rest on the California Court of Appeal's last reasoned decision.[21] This Court therefore has reviewed the Court of Appeal's decision discussing those claims under the AEDPA standards set forth above.

The claims that Petitioner raised for the first time in his state habeas petitions are procedurally defaulted. Nonetheless, "when a state court 'double-barrels' its decision – holding that a claim was procedurally barred and denying the claim on its merits – both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA."[22] Accordingly, this Court has reviewed Petitioner's procedurally defaulted claims

---

[18] See Williams, 529 U.S. at 406-10, 413.

[19] Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) ("Under § 2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable.") (internal quotation marks and citations omitted); Woodford v. Visciotti, 537 U.S. 19, 27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).

[20] Williams, 529 U.S. at 409-10.

[21] See Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); see also Wilson v. Sellers, ___ U.S. ___, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018) (federal courts should "look through" unexplained decision to the last reasoned state-court decision providing a relevant rationale).

[22] Apelt v. Ryan, 878 F.3d 800, 825 (9th Cir. 2017) (observing "orders should not be construed as holding that, because the state court reached the merits of Apelt's claim, the federal court can ignore the procedural default. . . . where a state court expressly invokes a procedural bar, the claim is defaulted, even though the state goes on to discuss the merits of the claim") (citations omitted); Clabourne v. Ryan, 745 F.3d 362, 383 (9th Cir. 2014) (holding that where state court simultaneously rejected claim on procedural ground and on the merits, AEDPA deference applies to "alternative holding on the merits"), overruled on other grounds by McKinney v. Ryan, 813 F.3d 798 (9th Cir. 2015) (en banc), cert. denied, 137 S. Ct. 39 (2016); see also Ans. Memo at 6 (noting that the relevant decision for AEDPA review for the claims raised on habeas is the "last one with a relevant explanation for denying relief").

under the AEDPA standards set forth above, considering the Superior Court's reasoned decision denying those claims on the merits.[23]

**VI.**

**DISCUSSION**[24]

For ease of analysis, this Court is addressing Petitioner's claims in a different order than presented.

**A.    Sufficiency of the Evidence**

In Claims Two and Five, Petitioner contends that the trial evidence was insufficient to support his murder conviction.  (Pet. Att. at 8-11, 17-23; Trav. Memo at 7-8, 11-13.)  Petitioner argues that the prosecution did not prove Petitioner acted with malice aforethought, and that if the jury had been properly instructed it could have concluded that Petitioner acted "unthinkingly and without conscious disregard for human life."  (Pet. Att. at 19.)  Petitioner suggests the evidence showed that Petitioner: (1) "acted in rash response" to Fuentes hitting Petitioner in the face with asphalt and stabbing Petitioner with a wooden stake in the back; (2) acted "reactively, without thought, and without subjectively appreciating the nature of his actions as he defended himself from imminent danger"; (3) drank several beers shortly before the incident; and (4) suffers from bipolar disorder, manic depression, and obsessive compulsive disorder and had not taken all of his medications.  (Pet. Att. at 19-22.)  Petitioner suggests the evidence, including Petitioner's call to the sheriff's department, also showed that Petitioner believed Fuentes was "a danger to those around [Fuentes]" because Fuentes was belligerent and telling Petitioner that Fuentes had harmed family members in the past.  (Pet. Att. at 20-21.)

Petitioner also challenges the forensic pathologist's autopsy-related testimony that Fuentes died from multiple fatal stab wounds allegedly caused by a folding pocketknife.  (Pet.

---

[23] See Lambrix v. Singletary, 520 U.S. 518, 524-25, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (habeas court may consider merits of procedurally defaulted claim to conserve judicial resources); Flournoy v. Small, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012), cert. denied, 568 U.S. 1105 (2013) ("While we ordinarily resolve the issue of procedural bar prior to any consideration of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits.").

[24] This Court has read, considered, and rejected on the merits all of Petitioner's contentions.  This Court discusses Petitioner's principal contentions herein.

10

Att. at 8-9, 18.)  The pathologist testified that he examined Petitioner's knife recovered from the murder scene during Fuentes's autopsy – which the pathologist described in his report as a folding pocketknife – but Petitioner's knife had a fixed blade and did not fold.  (Pet. Att. at 8-10.)  Petitioner argues, as his counsel did in closing, that he was not accused of possessing the "putative weapon" (a folding pocketknife) (see 2 RT at 434), and therefore the State did not meet its burden in proving that Petitioner caused Fuentes's fatal stab wounds.  (Pet. Att. at 10, 18.)

### 1. Background

Petitioner has never denied stabbing Fuentes – the stabbing happened during Petitioner's 911 call to police and in front of several eyewitnesses.  Petitioner's defense at trial was that he stabbed Fuentes in self defense, and one of the men fighting at the scene who had a pocketknife caused Fuentes's three fatal stab wounds.  (1 RT 40; 2 RT at 426-35.)

The jury heard a lot of evidence that Petitioner stabbed Fuentes.  The prosecution properly introduced:  (1) Petitioner's spontaneous statements to responding police officers (saying, "I stabbed him.  I stabbed him.  He tried to stab [or kill] my dog," (see 1 RT at 126-27, 132-33 (related testimony)); "That's my knife I used to stab that guy," about a metal knife next to a wooden stake that was approximately 10 feet away from Petitioner (see 1 RT at 127-28, 137-39 (related testimony)); and "That is the holder and the handle to my knife over there" motioning toward the field while identifying a sheath and handle police removed from Petitioner's pocket (see RT at 139-40 (related testimony)); and (2) Petitioner's 911 call where Petitioner could be heard saying to Fuentes, "Don't make me crazy.  I'll f---ing slice your ass up, homie." (see 1 RT at 42-44 (Petitioner's 911 call played for the jury); 1 RT at 47-49 (Fuentes's brother identifying Fuentes's voice in the 911 call); 1 RT at 116-20 (Petitioner's fiancé identifying Petitioner's voice in the 911 call); 2 CT at 258-61 (transcript of 911 call recording the exchange between Petitioner and Fuentes)).

The jury also heard Petitioner's police interview.  (See 2 CT at 268-344 (transcript of interview)).  Petitioner said he "wanted to beat [Fuentes's] ass" after Fuentes threw a rock at Petitioner.  (2 CT at 320.)  Petitioner did not run away because of Petitioner's "pride" after being hit with the rock.  (2 CT at 324-25.)   Petitioner "wanted justice. . . [his] own street justice."  (2

1   CT at 309.)  Petitioner said he stabbed Fuentes because Petitioner was frustrated and angry that
2   Fuentes hit him with a rock and stabbed him in the back with a sharp stick.  (2 CT at 278-79,
3   295-96, 320.)[25]

4       Eyewitness Baltazar Flores testified that he was driving by when he saw two guys
5   (Petitioner and Fuentes) fighting in the middle of the street.  (1 RT at 56-57.)  One guy with a
6   dog (Petitioner) was "attacking pretty hard" and the other guy with long hair (Fuentes) was "just
7   defending himself," he "wasn't doing anything."  (1 RT at 57, 61, 63-64, 66, 78-79, 88-89; see
8   also 2 RT at 309-10 (Detective Munoz testifying about photographs of Petitioner and Fuentes
9   that Flores took with his cell phone).)  Flores saw Petitioner punching Fuentes and pushing him
10  to the field.  (1 RT at 58, 61-62, 64-65, 88.)  Fuentes was putting his hands up to cover and
11  protect himself and backing away.  (1 RT at 62, 64, 76, 78, 89, 100.)  Flores never saw anything
12  in Fuentes's hands and never saw Fuentes swing at Petitioner.  (1 RT at 76, 89-90, 100.)

13      Flores saw Fuentes on the ground in the field and Petitioner holding Fuentes's hair in the
14  back while punching Fuentes.  (1 RT at 66.)  Fuentes was still holding his head to protect
15  himself.  (1 RT at 67.)  Fuentes was on his knees facing away from Petitioner when Petitioner
16  began stabbing Fuentes "really fast" with a "clear white" six- or seven-inch knife while still
17  holding Fuentes's hair from behind.  (1 RT 67-71, 93.)

18      After Flores saw Petitioner stab Fuentes about five times in the chest, Flores parked his
19  truck and tried to get Petitioner to stop.  (1 RT at 68-69.)  Flores picked up a rock and told
20  Petitioner to "leave it alone." (1 RT at 69.)  Petitioner "never stopped" stabbing Fuentes until
21  Flores was two and a half feet away and threatened Petitioner with the rock.  (1 RT at 69.)  As
22  Flores was running toward the men, Flores saw Petitioner stabbing Fuentes four or five times in
23  the chest.  (1 RT at 70; but see 1 RT at 78, 91-92, 100 (Flores estimating Petitioner stabbed
24  Fuentes "maybe" six to seven times total (and not more than ten times).)  Petitioner lashed out at
25  Flores then stabbed Fuentes in the mouth.  (1 RT at 69-70.)

---

[25] Detective Munoz testified that the broken broom stick that police recovered appeared to have blood on it
consistent with what Petitioner told Munoz about being stabbed.  (2 RT at 325-27.)  Detective Munoz said Petitioner
appeared to have been honest about the stick in his interview.  (2 RT at 327.)

The violence against Fuentes finally ended when another bystander (Edgar Santiago) came and began fighting with Petitioner. (1 RT at 72-73, 103-04; 2 RT at 288, 293-94.) Flores saw someone from "the public" throw a rock and hit Petitioner's back "pretty good" which made Petitioner sit down until police arrived. (1 RT at 75.)

The forensic pathologist who autopsied Fuentes testified from his "autopsy protocol" that Fuentes had multiple "sharp force wounds" (consistent with stabbing) to Fuentes's forehead, nose, head, left side of his head, mouth, near his mouth, right side of his face, right ear, left ear, neck, chest, abdomen, left armpit, left elbow, left hand, left forearm, and right forearm. (1 RT at 155, 158-78, 183.) Regarding the possible murder weapon, the pathologist identified photographs showing a knife that does not fold in half as the "putative weapon" – the knife police brought to the autopsy presumed to be the murder weapon. (1 RT at 157-58, 186-88, 193-94; see also 2 RT at 228-29, 232-33 (forensic specialist testifying that she brought a fixed blade knife to Fuentes's autopsy with the "tag number" under "2013 692," which should have been "2014 692"); 2 RT at 253-56 (detective identifying Petitioner's fixed blade knife with a broken handle in court as tagged under "[20]14-692").) Contrary to the pathologist's testimony, the pathologist's autopsy protocol described the "putative weapon" as a pocketknife that "folded in half." (1 RT at 187, 189, 192; see also 2 RT at 267 (detective testifying that his report stated that police removed a folding knife from Petitioner based on the information he was given at the time).) The pathologist could not tell from his autopsy findings exactly what weapon caused Fuentes's wounds. (1 RT at 191.)

There were three known knives at the scene. In addition to Petitioner's knife recovered from the field (see 1 RT at 137-39; 2 RT 251-56), Santiago had a pocketknife which he later gave to police. (1 RT at 200, 208; 2 RT at 235, 284.) [26] Flores also had a pocketknife that he used for work, but Flores said he did not take it out. (RT 89, 106.) Santiago's wife testified that Santiago stabbed Petitioner's dog after it bit Santiago's foot. (1 RT at 201, 204-07; 2 RT at 296-97.) Santiago's wife said that Santiago never used his knife on "the guy on the floor" (Fuentes) – Santiago was trying to help Fuentes. (1 RT at 206, 211; 2 RT at 293.) Although Santiago's

---

[26] Santiago's knife, which was in evidence, may have had blood on it. (1 RT at 188; 2 RT at 235-36, 243.)

wife said she saw Flores holding a knife while throwing rocks at Petitioner's dog, she said Flores never used his knife – he also was trying to help Fuentes.  (2 RT 281-85, 288, 291, 293.)[27]

### 2.    State Court Decision

The Superior Court issued the last reasoned decision rejecting Claims Two and Five on the merits as a "misguided attempt to at a re-do of the trial Petitioner lost." (Lodgment 11 at 4 (noting that weighing the evidence and credibility determinations are for the trial court).)  The Superior Court reasoned: "Did it really make any difference how the knife was described [in the autopsy protocol] or the exact number of times Petitioner stabbed the victim, given the undisputed evidence Petitioner was the person that stabbed the victim to death?" (Lodgment 11 at 4-5.)   The Superior Court agreed with the California Court of Appeal that the "evidence left no room for reasonable doubt that [Petitioner] acted with intent to kill or conscious disregard for human life, and he knew the risk involved to Fuentes when he violently attacked him with a knife." (Lodgment 11 at 4 (quoting Lodgment 6 at 13).)   The evidence included Flores's eyewitness testimony that Petitioner stabbed Fuentes while Fuentes was on the ground and helpless.  (Lodgment 11 at 3; see also Lodgment 6 at 12 (referencing Flores's testimony).)

### 3.    Legal Standard

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[28]  In Jackson v. Virginia,[29] the United States Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction.  Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."[30]  The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

---

[27] Detective Munoz examined Flores's knife and found no evidence of blood.  (2 RT at 310-11, 320.)  Munoz said he had no reason to believe that Flores was a stabber.  (2 RT at 321.)

[28] In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

[29] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

[30] Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

14

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[31]
"Put another way, the dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"[32]

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the federal court must defer to that resolution.[33] Additionally, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."[34]

### 4. Analysis

There is no merit to Petitioner's sufficiency of the evidence claims. The Superior Court instructed the jury on murder, manslaughter due to sudden quarrel/heat of passion or imperfect self defense, and justified killing in self defense. (2 RT at 366-77; 2 CT at 192-204.) To convict Petitioner of second degree murder, the jury had to find that Petitioner committed an act that caused the death of another, with malice aforethought, and without lawful excuse or justification. (2 RT at 370; 2 CT at 196.) Express malice aforethought means the perpetrator acted with intent to kill.[35] Implied malice aforethought exists where a defendant intentionally (1) committed an act, (2) the natural and probable consequences of the act were dangerous to human life, (3) at the time he acted he knew his act was dangerous to human life, and (4) he deliberately acted with conscious disregard for human life. (2 RT at 370; 2 CT at 196-97.)

Viewing the evidence in the light most favorable to the verdict, the evidence amply supported Petitioner's second degree murder conviction. The undisputed evidence showed that Petitioner stabbed Fuentes repeatedly, and that Fuentes died from multiple stab wounds. Petitioner admits that the act of stabbing Fuentes satisfied the objective element of implied

---

[31] <u>Jackson</u>, <u>443 U.S. at 319</u>.

[32] <u>Chein v. Shumsky</u>, <u>373 F.3d 978, 982-83</u> (9th Cir. 2004) (en banc) (quoting <u>Jackson</u>, <u>443 U.S. at 318</u>).

[33] <u>Jackson</u>, <u>443 U.S. at 326</u>.

[34] <u>Walters v. Maass</u>, <u>45 F.3d 1355, 1358</u> (9th Cir. 1995) (citation omitted).

[35] <u>People v. Swain</u>, <u>12 Cal. 4th 593, 601</u> (1996).

malice because the natural consequences of such an act are dangerous to human life. (Pet. Att. at 38.) Petitioner argues that he did not appreciate the danger to human life that his conduct posed, and did not act with conscious disregard for human life, because he was "blacked out," drank several beers, and had not taken his medication for his mental illness. (Pet. Att. at 38-39.) However, a rational trier of fact could have concluded from the evidence that Petitioner was aware and knew of the danger to Fuentes from stabbing him. Petitioner's non-emergency call to police showed that he was able to call and have a normal conversation with police before the stabbing. (2 CT at 345-48.) In his interview with Detective Munoz, Petitioner was cooperative and coherent and said that he told the responding police while Fuentes was lying on the ground in agony, "Hey, officer, hey I apologize. Hey, make sure that guy, you know, make sure he lives." (2 CT at 302.) This evidence suggests Petitioner was aware and knew that his actions could kill Fuentes.

A rational trier of fact could also conclude that Petitioner deliberately acted with conscious disregard for Fuentes's life by the number of times Petitioner stabbed Fuentes. Flores witnessed Petitioner hitting then stabbing the Fuentes at least six times in the chest while Fuentes was doing nothing but trying to protect his head. Petitioner admittedly stabbed Fuentes at least seven times to enact his own "street justice." (2 CT 307, 312.) The forensic pathologist testified to many more stab wounds. The act of repeatedly stabbing someone supports a finding not only of implied malice but also intent to kill for express malice.[36]

The jury considered and rejected Petitioner's version of the events from his police interview that he acted in response to Fuentes's aggression, in his defense, after drinking several beers, and while suffering from mental illness. The jury also considered and rejected Petitioner's argument that he did not inflict the fatal stab wounds because the pathologist's written autopsy protocol noted that the putative murder weapon was a folding knife (where the pathologist had

---

[36] See People v. Avila, 46 Cal. 4th 680, 701-02 (2009), cert. denied, 558 U.S. 1126 (2010) (evidence that defendant attempted to stab an unarmed and trapped victim repeatedly and stabbed him in the arm and leg was substantial evidence of intent to kill); People v. San Nicolas, 34 Cal.4th 614, 659 (2004), cert. denied, 546 U.S. 829 (2005) (intent to kill supported by "sheer number of wounds" on victim's body, "many of which individually would have been fatal.").

testified that the knife he looked at was Petitioner's knife). [37]  It is not for this Court to reweigh this evidence that was before the jury.[38]

For these reasons, the state courts' rejection of Claims Two and Five does not merit federal habeas relief.

**B.**    **<u>Miranda</u> Claim**

In Claim Seven, Petitioner contends that he did not knowingly and voluntarily waive his <u>Miranda</u> rights and invoked his right to counsel, so the Superior Court should have excluded his interview with Detective Munoz from trial.  (Pet. Att. 28-32; Trav. Memo at 15.)

**1.**    **Background**

Detective Munoz interviewed Petitioner at the police station after he interviewed Flores. (2 CT at 268-344; 2 RT at 311.)  Detective Munoz told Petitioner that he was a detective and had been assigned to investigate what happened.  (2 CT at 269.)  Detective Munoz said the police had spoken to "quite a few witnesses already" and had a "pretty good idea" of what happened. (2 CT at 269.)  Detective Munoz continued:

> Det. Munoz:  . . . [T]here's always two sides to the story. . . .  I would like to know what the other side of the story is cause we've only heard one side right now. . . .  [W]hat I'd like you to do is. . . just tell me truth

---

[37] Consistent with the jury instructions given, Petitioner's counsel had argued in closing that Petitioner acted in self defense.  Counsel argued that Fuentes had been in Patton State Hospital, had mental health issues, had stabbed or cut his own family members, was acting strange, and that Petitioner knew that Fuentes was capable of violence. (2 RT at 421-23, 432-33.)  Fuentes got angry and became violent, hit Petitioner in the face with a large chunk of asphalt or rock and, when Petitioner responded by using the least amount of force to stop Fuentes by picking up a stick and hitting Fuentes in the leg, Fuentes escalated things by attacking Petitioner with a large stick (a dangerous weapon). (2 RT at 423-24 (playing for the jury the witness 911 call telling the police two men were fighting, one had a stick and one had a knife (2 CT at 262-67)), 431-33.)  Counsel argued that these acts provoked Petitioner into acting in self defense.  (2 RT at 432-34, 436.)

Counsel also argued reasonable doubt that Petitioner's knife caused the fatal stab wounds because the pathologist had determined the putative murder weapon which allegedly caused the three fatal stab wounds was a folding knife, Santiago and Flores both had folding knives (not Petitioner), and neither of their knives were tested for Fuentes's blood.  (2 RT at 426-30, 434-35.)  Santiago's shirt had blood on it, he was seen smiling after the stabbing, he was in custody on charges for being a felon in possession of a firearm with gang allegations, and the police did not bother to test Santiago's clothes or knife for Fuentes's blood. (2 RT at 429-30.)

[38] <u>United States v. Nevils</u>, <u>598 F.3d 1158, 1170</u> (9th Cir. 2010).

17

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | and we'll go from there okay? ¶ But. . . before we do that. . . I need |
| 2  | to advise you of your rights.  You know what your rights are? |

1      and we'll go from there okay? ¶ But. . . before we do that. . . I need

2      to advise you of your rights.  You know what your rights are?

3   [Petitioner]:  Right to remain silent, and anything I say can . . .

4   Det. Munoz:  Yeah. Have you had, have you had your rights read to you before?

5   [Petitioner]:  Yes, before, but not today.

6   Det. Munoz:  Not today.  Okay, well, I'm gonna do that before I ask. . . pertaining

7      to this investigation I have to ask you specific questions, okay, so, but

8      before I do that I want to advise you of your rights, okay?

9   [Petitioner]:  Not a problem.

10   Det. Munoz:  All right. Uh, do you know how to read?

11   [Petitioner]:  Yes. . . .

12   Det. Munoz:  English and all that?

13   [Petitioner]:  English.

14   Det. Munoz:  Okay I'm gonna read you your rights and I'm gonna show you this

15      form here.  This has got your rights on it.  I'm gonna substitute the

16      word "I" with the word "you", okay?

17   [Petitioner]:  Okay.

18   Det. Munoz:  Okay.  Number one says you have the absolute right to remain

19      silent.  Okay?  Number two is anything you say can and will be used

20      as evidence against you in court Okay.  You understand that?

21   [Petitioner]:  Yes, sir.

22   Det. Munoz:  Okay.  You have the right to be represented by an attorney and to

23      consult with him before making any statements or answering any

24      questions.  You have the right to have any attorney present during

25      questionings, okay?  All right?  ¶ Number four is if you cannot afford

26      an attorney one will be appointed by the court free-of-charge to

27      represent you before any questioning if you desire.  Okay.  You

28      understand these rights I've just explained to you?

18

| | |
|---|---|
| 1 | [Petitioner]: Yes, sir. |
| 2 | Det. Munoz: Okay, with these rights in mind, are you willing to talk to me? |
| 3 | [Petitioner]: . . . Excuse me. Mm. If you cannot afford one will be appointed by |
| 4 | the court free-of-charge to represent me before any questions, if I |
| 5 | desire. Hm. I'll tell you what happened, you, but I know I'm gonna |
| 6 | need an attorney. Cause. . . |
| 7 | Det. Munoz: Okay. Well, you have to tell me that, okay? You, and I, I want to |
| 8 | know now before. . . |
| 9 | [Petitioner]: I'll let you know my side of the story. |
| 10 | Det. Munoz: Okay. And. . . |
| 11 | [Petitioner]: I have nothing to hide. |
| 12 | Det. Munoz: All right. |
| 13 | [Petitioner]: Like, I, oh I'm sorry. |
| 14 | Det. Munoz: But, um, okay, would you like to have. . . an attorney present during |
| 15 | this questioning? Cause that's your right. That's up to you. |
| 16 | [Petitioner]: No, I'll tell you my story right now. That's the only way I can get |
| 17 | up on my way. |
| 18 | Det. Munoz: Okay. |
| 19 | [Petitioner]: And like I said, nothing to hide. |
| 20 | Det. Munoz: Okay. But you know. . . the court will. . . appoint you. . . an |
| 21 | attorney free-of-charge like you said. |
| 22 | [Petitioner]: I know I'm gonna need one after, you know, I, I did damage to the |
| 23 | guy I know that. |
| 24 | Det. Munoz: Okay. |
| 25 | [Petitioner]: So I know after a while, I'm gonna need an attorney. Yeah. |
| 26 | Det. Munoz: Okay. So are you willing to talk to me now about this? |
| 27 | [Petitioner]: Not a problem, sir. |
| 28 | |

1  (2 CT at 270-73 (original spelling and punctuation).)   Detective Munoz then questioned
2  Petitioner about the stabbing.  (2 CT at 273-333.)

3         After answering questions and describing the incident in detail, Petitioner asked if he
4  could call his daughter and Detective Munoz said, "I have to put you in jail." (2 CT at 333.)
5  Detective Munoz said he was going to take Petitioner's clothes and take pictures of Petitioner's
6  injuries. (2 CT at 333.) After again asking if he could call his daughter and being told no,
7  Petitioner asked, "Can I have my lawyer?" (2 CT at 333-34.) Detective Munoz answered,
8  "Yeah, . . . you'll be appointed a lawyer, too." (2 CT at 334.) Petitioner replied, "Yeah, I need
9  one of those right now." (2 CT at 334.)

10        Detective Munoz left the room for a few minutes. (2 CT 334.) When Detective Munoz
11 returned, he asked Petitioner if Petitioner had any mental problems or issues. (2 CT at 334.)
12 Petitioner replied, "I don't believe so, but. . . . The doctors. . . diagnosed me with manic
13 depression, bipolar and OCD." (2 CT at 334-35.) Detective Munoz asked if Petitioner was
14 taking medication. (2 CT at 335.) Petitioner said he was taking Seroquel, Dapakote, and Zoloft,
15 and had not taken his Depakote in a couple days. (2 CT at 335.) Detective Munoz asked
16 Petitioner how much he had to drink and what he had to drink. (2 CT at 336, 338-39.) Petitioner
17 said he drank two beers before the incident. (2 CT at 336, 338.) Detective Munoz also asked
18 Petitioner about the wounds being photographed. (2 CT at 337-38.)

19        There is no discussion in the available record about any Miranda issues with Petitioner's
20 interview.[39] The prosecution played for the jury the video of Petitioner's interview without
21 objection. (2 RT at 312-16.) Detective Munoz testified that Petitioner did not appear to have any
22 difficulty understanding or communicating with him during the interview. (2 RT at 316.)

23        **2.      State Court Decision**

24        The Superior Court issued the last reasoned decision denying this claim, finding the trial
25 court properly admitted Petitioner's confession. (Lodgment 11 at 5.) Petitioner had alleged that
26 any waiver of his right to counsel was invalid given Petitioner's age, state of mind, and requests

27

28 [39] Superior Court minutes from September 29, 2016, report a pretrial hearing regarding Miranda issues but not the
   ruling. (1 CT at 89-90.) Petitioner states that the Superior Court found no Miranda issues.  (Pet. Att. at 30.)

20

for counsel. (Lodgment 10 at 19-21.)  The Superior Court found no issue based on these allegations because: (1) a waiver of Miranda rights may be implied; and (2) United States Supreme Court precedent does not require that questions cease "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel." (Lodgment 11 at 5 (quoting Davis v. United States[40]).)

### 3. Legal Standard

In Miranda, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination [under the Fifth and Fourteenth Amendments to the Constitution]."[41]  Under Miranda, before custodial interrogation the police must inform a suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning."[42]

"Even absent [a suspect's] invocation of the right to remain silent, the [suspect's] statement during a custodial interrogation is inadmissable at trial unless the prosecution can establish that the [suspect] 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement."[43]  An express waiver of Miranda rights is not necessary.[44]  Instead, a valid waiver of rights may be implied under the circumstances presented in the particular case.[45] As a general proposition, the "law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice

[40] 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

[41] See Dickerson v. United States, 530 U.S. 428, 431, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (holding that "Miranda and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts").

[42] Miranda, 384 U.S. at 479.

[43] Berghuis v. Thompkins, 560 U.S. 370, 382, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (citation omitted).

[44] Id. at 384; North Carolina v. Butler, 441 U.S. 369, 373-75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

[45] See Berghuis, 560 U.S. at 384; Butler, 441 U.S. at 373.

to relinquish the protection those rights afford."[46]  For instance, "'a suspect may impliedly waive the rights by answering an officer's questions after receiving <u>Miranda</u> warnings.'"[47]

If a suspect chooses to invoke his <u>Miranda</u> rights, he must unambiguously and unequivocally invoke those rights.[48]  The requirement of an unambiguous invocation "'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity."[49]  As the Superior Court noted, if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking his [<u>Miranda</u>] right[s]," the officers are not required to cease questioning.[50]

### 4. Analysis

By choosing to speak with Detective Munoz after several advisements and opportunities to request counsel, Petitioner impliedly waived his <u>Miranda</u> rights.[51]  Petitioner's initial statements about needing an attorney "after a while" did not unequivocally and unambiguously invoke his <u>Miranda</u> rights.[52]  Detective Munoz did not have to stop the interrogation.[53]  The Superior Court's finding no issue with admitting Petitioner's confession was not unreasonable.[54]

---

[46] <u>Berghuis</u>, <u>560 U.S. at 385</u>.

[47] <u>United States v. Rodriguez</u>, <u>518 F.3d 1072, 1080</u> (9th Cir. 2008) (quoting <u>United States v. Rodriguez-Preciado</u>, <u>399 F.3d 1118, 1127</u> (9th Cir. 2005)).

[48] <u>Berghuis</u>, <u>560 U.S. at 381-82</u> (discussing the right to remain silent); <u>Davis</u>, <u>512 U.S. at 458-61</u> (discussing the right to counsel).

[49] <u>Id.</u> at 381 (quoting <u>Davis</u>, <u>512 U.S. at 458-59</u>).

[50] <u>Davis</u>, <u>512 U.S. at 459</u> (emphasis original).

[51] <u>Rodriguez</u>, <u>518 F.3d at 1080</u>.

[52] <u>Davis</u>, <u>512 U.S. at 462</u> ("[m]aybe I should talk to a lawyer" not an unambiguous request for counsel); <u>United States v. Younger</u>, <u>398 F.3d 1179, 1187</u> (9th Cir. 2005) (statement "[b]ut, excuse me, if I am right, I can have a lawyer present through all this, right?" did not unambiguously invoke right to counsel); <u>see also</u> <u>Paulino v. Castro</u>, <u>371 F.3d 1083, 1087</u> (9th Cir. 2004) ("[w]here's the attorney" and "[y]ou mean it's gonna take him long to come?" not unambiguous requests for counsel); <u>United States v. Doe</u>, <u>170 F.3d 1162, 1166</u> (9th Cir.1999) ("[w]hat time will I see a lawyer?" not an unambiguous request for counsel).

[53] <u>Davis</u>, <u>512 U.S. at 459</u>.

[54] Petitioner asserts that he did not knowingly and voluntarily waive his <u>Miranda</u> rights under the circumstances because was only 22 years old, had just been assaulted, was intoxicated, and had not taken his psychiatric medications. (Trav. Memo at 31.)  These facts alone do not suggest his waiver was not knowing or voluntary.  <u>See</u> <u>Benson v. Chappell</u>, <u>958 F.3d 801, 840</u> (9th Cir. 2020) (person with mental illness/defects can waive <u>Miranda</u> rights), <u>cert. dismissed</u>, <u>141 S. Ct. 2779</u> (2021); <u>Matylinsky v. Budge</u>, <u>577 F.3d 1083, 1095-96</u> (9th Cir. 2009) (intoxicated person can waive <u>Miranda</u> rights); <u>Juan H. v. Allen</u>, <u>408 F.3d at 1272</u> (juvenile can waive <u>Miranda</u> rights).

1    Petitioner's statement near the end of the interview that he needed an attorney "right
2    now," arguably invoked his right to counsel.  Had Petitioner's counsel objected, the questioning
3    and answers after about Petitioner's mental health issues, drinking that day, and injuries from
4    Fuentes may have been excluded from trial.   However, even assuming for the sake of argument
5    that some (or all) of Petitioner's interview should have been excluded under <u>Miranda</u>, any error
6    from presenting the interview to the jury was harmless.

7    The erroneous admission of a defendant's testimony in violation of the Fifth Amendment
8    is subject to harmless error analysis.[55]  Admission is harmless unless the erroneously admitted
9    evidence had a "substantial and injurious effect or influence in determining the jury's verdict."[56]
10   Based on the Court's independent review of the record, this Court finds no prejudice from the
11   use of Petitioner's interview (in whole or in part).

12   As detailed above, the prosecution properly introduced other statements from Petitioner
13   suggesting that the admission of his confession was harmless.  The jury heard Petitioner's 911
14   call, where Petitioner could be heard saying to Fuentes, "Don't make me crazy.  I'll f---ing slice
15   your ass up, homie." (2 CT at 259-60.)  Petitioner said this just before it sounded like Fuentes
16   was injured, and followed up with "Hey, I f---ing kicked your ass or what?!"  (2 CT at 260.)  The
17   jury also heard Petitioner's spontaneous statements to responding police officers that he stabbed
18   Fuentes with his knife.  (1 RT at 126-28, 132-33, 137-40.)[57]

19   Even if the jury had not heard *any* of Petitioner's statements, the other evidence showing
20   that Petitioner murdered Fuentes was strong.  As detailed in Section VI.A above, several
21   witnesses saw Petitioner attacking and stabbing Fuentes (who then posed no threat to Petitioner),
22   police detained Petitioner at the scene moments after the stabbing, and Fuentes died from
23   multiple stab wounds.

24

---

[55] <u>Neder v. United States</u>, <u>527 U.S. 1, 18</u>, <u>119 S. Ct. 1827</u>, <u>144 L. Ed. 2d 35</u> (1999); <u>Ghent v. Woodford</u>, <u>279 F.3d 1121, 1126</u> (9th Cir. 2002).

[56] <u>Brecht v. Abrahamson</u>, <u>507 U.S. 619, 623</u>, <u>113 S. Ct. 1710</u>, <u>123 L. Ed. 2d 353</u> (1993).

[57] The Superior Court instructed the jury that Petitioner could not be convicted based on his out-of-court statements alone.  (2 RT at 365.)  The jury is presumed to have followed this instruction.  <u>Weeks v. Angelone</u>, <u>528 U.S. 225, 234</u>, <u>120 S. Ct. 727</u>, <u>145 L. Ed. 2d 727</u> (2000).

For these reasons, the state courts' rejection of Claim Seven does not merit federal habeas relief. Petitioner has not shown a constitutional violation from the admission of his interview.[58]

## C. Ineffective Assistance of Counsel

In Claim One, Petitioner contends that his trial and appellate counsel rendered ineffective assistance by: (1) trial counsel's failure to move to suppress Petitioner's confession under <u>Miranda</u>; (2) trial counsel's failure to conduct a reasonable investigation for DNA testing of blood and fingerprints on the "putative weapon" (pocketknife); (3) trial counsel's failure to object to a police property report produced mid-trial; and (4) appellate counsel's failure to raise Petitioner's assertedly meritorious claims on direct appeal. (Pet. Att. at 1-8; Trav. Memo at 4-7.)

### 1. Background

As detailed in Footnote 39 above, the Superior Court held a <u>Miranda</u> hearing before trial and found no <u>Miranda</u> issue. Regarding Petitioner's other allegations, Petitioner alleges that he told trial counsel that the pathologist described the "putative weapon" in the autopsy protocol as a "pocketknife" (which was not Petitioner's knife). (Pet. Att. at 3.) Petitioner speculates that if counsel had requested DNA testing of any blood and fingerprints on the "putative weapon" (Santiago's pocketknife that was in evidence), it would have ruled out Petitioner as the suspect who used that knife. (Pet. Att. at 3-4.) As detailed in Footnote 37 above, Counsel used the lack of testing on the pocketknife to argue reasonable doubt that Petitioner caused Fuentes's fatal stab wounds.

Mid-trial, after the pathologist testified that his autopsy protocol listed the "putative weapon" as a pocketknife, the prosecutor disclosed to Petitioner's counsel a "property control report" for the items the police "tagged" into evidence with their "tag numbers." (2 RT 215-20.) Petitioner's counsel noted that the tag number for the "putative weapon" on the newly-found property control report was different from the tag number reportedly listed in the autopsy protocol[59] – it appeared to counsel that the tag numbers for the folding pocketknife and

---

[58] <u>28 U.S.C. § 2254(a)</u>.

[59] The pathologist did not testify about the putative weapon's tag number (2 RT at 187-92), and the autopsy protocol is not in the record.

24

Petitioner's knife were "switched." (2 RT at 217-18.) Petitioner's counsel asked for time to review the new evidence. (2 RT at 218.) The Superior Court found no willful discovery violation and gave Petitioner's counsel time to investigate. (2 RT at 218-19.)

As detailed in Section VI.A.1 above, a forensic specialist later testified that she brought a fixed blade knife to Fuentes's autopsy tagged under "2013 [sic] 692." (2 RT at 227-29, 232-33.) A detective identified Petitioner's fixed blade knife with a broken handle in court as tagged under "14-692." (2 RT at 253-56.)

### 2. State Court Decision

The Superior Court issued the last reasoned decision denying Claim One on the merits. (Lodgment 11 at 5-6.) The Superior Court found that because the trial court properly admitted Petitioner's confession, any ineffective assistance of trial or appellate counsel claim based on the admission failed to show either deficient performance or prejudice. (Lodgment 11 at 5-6.) As for the remainder of Petitioner's "contrived" ineffective assistance claims, the Superior Court found no prejudice given the undisputed evidence that Fuentes died because Petitioner stabbed Fuentes several times. (Lodgment 11 at 6.)

### 3. Legal Standard

The standard for obtaining relief on ineffective assistance of counsel claims is difficult to meet. In order to prevail on his ineffective assistance of counsel claim under the United States Supreme Court decision in <u>Strickland v. Washington</u>, Petitioner must prove two things: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.[60] A court evaluating an ineffective assistance of counsel claim does not need to address both elements of the test if a petitioner cannot prove one of them.[61]

To prove deficient performance, a petitioner must show that counsel's performance was below an objective standard of reasonableness.[62] There is a "strong presumption that counsel's

---

[60] <u>Strickland v. Washington</u>, <u>466 U.S. 668, 687</u>, <u>104 S. Ct. 2052</u>, <u>80 L. Ed. 2d 674</u> (1984).

[61] <u>Id.</u> at 697.

[62] <u>Id.</u> at 687-88.

conduct falls within the wide range of reasonable professional assistance."[63] Only if counsel's acts or omissions, examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally competent assistance will petitioner prove deficient performance.[64] Proof of deficient performance does not require habeas corpus relief if the error did not result in prejudice.[65] Accordingly, a petitioner must also show that, but for counsel's unprofessional errors, the result of the proceedings would have been different.[66]

### 4. Analysis

Petitioner has not shown that his trial counsel was deficient for failing to raise a <u>Miranda</u> claim, have the pocketknife tested, or challenge the property report produced mid-trial, or that these failures prejudiced him. As explained in Section VI.B above, Petitioner's counsel cannot be faulted for failing to raise a <u>Miranda</u> violation since Petitioner waived his rights for the bulk of Petitioner's interview, and otherwise any <u>Miranda</u> violation was harmless in light of the record as a whole. It is not at all likely that the result of Petitioner's trial would have been different had counsel raised a <u>Miranda</u> claim.

As explained in Section VI.A.4 above, any lack of testing on the pocketknife in evidence or objection to the mid-trial property report identifying the "putative weapon" as Petitioner's knife would not have merited relief. The pathologist did not say that the pocketknife was the weapon that caused Fuentes's fatal injuries – the pathologist said he could not tell exactly what weapon was used to inflict Fuentes's injuries. (1 RT at 191.) The jury considered and rejected Petitioner's theory that someone else used a pocketknife to fatally stab Fuentes. Petitioner's speculation about what testing the pocketknife may have shown cannot establish prejudice.[67]

In any event, the murder case against Petitioner was very strong. Flores saw Petitioner repeatedly stabbing Fuentes, Petitioner admitted to responding police officers that he stabbed

---

[63] <u>Id.</u> at 689.

[64] <u>Id.</u> at 690.

[65] <u>Id.</u> at 691.

[66] <u>Id.</u> at 694.

[67] <u>Grisby v. Blodgett</u>, <u>130 F.3d 365, 373</u> (9th Cir. 1997) (speculation about what an expert could have said is not enough to establish <u>Strickland</u> prejudice).

1    Fuentes with his knife, and there was no credible evidence that anyone other than Petitioner

2    stabbed Fuentes.  It is not at all likely that the result of Petitioner's trial would have been

3    different if counsel had challenged this evidence.

4          Finally, there is no merit to Petitioner's claim of ineffective assistance of appellate

5    counsel for failing to raise assertedly meritorious claims on direct appeal.  As explained in this

6    Report and Recommendation, the state courts found, and this Court agrees, that all of Petitioner's

7    claims lack merit.  Petitioner's appellate counsel was not ineffective for failing to present

8    meritless claims.[68]

9          For these reasons, the state courts' rejection of Claim One does not merit federal habeas

10   relief.

11   **D.      Prosecutorial Misstatements**

12         In Claim Three, Petitioner contends that the prosecution misstated material facts to the

13   jury.  Petitioner argues that the prosecutor wrongfully exaggerated the number of times Fuentes

14   was stabbed to convince the jury to convict Petitioner of murder instead of a lesser manslaughter

15   charge.  (Pet. Att. at 11-14; Trav. Memo at 8-10.)

16         **1.      Background**

17         In his opening statement to the jury, the prosecutor stated that Petitioner stabbed Fuentes

18   at least 15 times and Fuentes died as a result.  (1 RT at 34.)  In his closing argument, the

19   prosecutor told the jury many times that Petitioner stabbed Fuentes "20 plus times."  The

20   prosecutor began by noting the locations of the 13 stab wounds to Fuentes's head area, and

21   evidence that Fuentes had six stab wounds to the chest and abdomen area, and three stab wounds

22   to his left arm.  (2 RT at 397-98.)   The prosecutor argued:

23         Every time [Petitioner] drove the knife into the victim, he intended to kill the

24         victim, whether it is the 13th time, 14th time, 15th time, 19th time.  Any time he

25         jabbed the thing in to the victim, he intended to kill him.

26

27

28   [68] Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct
     appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal.").

(2 RT at 398; see also 2 RT at 403 (referencing "13, 14, 15, 16" stabs).) In arguing excessive force and conscious disregard for human life, the prosecutor repeatedly said that Petitioner stabbed Fuentes "20 plus times." (2 RT at 403.) In arguing against heat of passion, the prosecutor also asked whether a person of average disposition in the same situation would resort to stabbing somebody "20 plus times." (2 RT at 408.) The prosecutor suggested that Petitioner lied when he told Detective Munoz he stabbed Fuentes seven times – it was "20 plus times." (2 RT at 413.) Finally, the prosecutor noted that the defense might argue some discrepancies in the evidence, but asked the jury, "Does it change the fact that the defendant stabbed the victim 20 plus times killing him?" (2 RT at 415.)

In rebuttal to the defense's theory that someone else inflicted the fatal stab wounds, the prosecutor said that is not what happened – Petitioner stabbed Fuentes in the head area about 13, times, in the body about six times, and in the right arm – "20 plus times." (2 RT at 437-38.) Even if Santiago's knife had blood on it, which the prosecutor argued was due to stabbing Petitioner's dog, the prosecutor asked the jury if testing would make a difference if Petitioner "still stabbed the guy 20 plus times." (2 RT at 438.) The prosecutor again mentioned stabbing "20 plus times" in arguing against provocation and when the right to self defense ends. (2 RT at 442.)

### 2. State Court Decision

The Superior Court denied Petitioner's claim that the prosecutor misstated the number of times Petitioner stabbed Fuentes to inflame the jury. (Lodgment 11 at 1, 4-5). In finding any error harmless, the Superior Court reasoned, "Did it really make a difference. . . the exact number of times Petitioner stabbed the victim, given the undisputed evidence Petitioner was the person that stabbed the victim to death?" (Lodgment 11 at 4-5.)

### 3. Legal Standard

"A prosecutor's misleading and inflammatory arguments may violate a defendant's due process right to a fair trial."[69] Determining whether a due process violation occurred requires an examination of the entire proceedings so the prosecutor's conduct may be placed in its proper

---

[69] Sechrest v. Ignacio, 549 F.3d 789, 807 (9th Cir. 2008).

context.[70]  "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[71]

### 4.     Analysis

The record *supports* the prosecutor's statements about Fuentes being stabbed over 20 times.  Petitioner argues based on Flores's testimony (1 RT at 91-92) that the evidence showed that Petitioner stabbed Fuentes about seven times.  (Pet. Att. at 12.)  However, Petitioner overlooks the forensic pathologist's extensive testimony from Fuentes's autopsy identifying more than 20 "sharp force" injuries consistent with stab wounds (not dog bites).  (1 RT at 155, 158-78, 183.)   On this record, no due process violation occurred.  The state courts' rejection of Claim Three does not merit federal habeas relief.

## E.     **Brady** Claim

In Claim Four, Petitioner contends the prosecutor failed to disclose <u>Brady</u> evidence.  (Pet. Att. at 14-17; Trav. Memo at 10-11.)   Petitioner argues that the prosecutor had a duty to disclose but withheld Fuentes's juvenile records showing Fuentes had a history of violence and erratic behavior.  (Pet. Att. at 15-16.)   Petitioner also faults the Superior Court for not reviewing any juvenile records in camera to determine whether the records should be disclosed.  (Pet. Att. at 16.)   Petitioner suggests that evidence of Fuentes's prior erratic and violent behavior would have supported Petitioner's claim of self defense.  (Pet. Att. at 17.)

### 1.     Background

Petitioner had two trials due to late disclosure of evidence regarding Fuentes's past.  Just after the Superior Court empaneled the jury in Petitioner's first trial, the Superior Court granted Petitioner a mistrial because the defense discovered through investigation that Fuentes had been committed to Patton State Hospital ("Patton").  (1 RT at 1-5.)[72]  The Patton records disclosed

---

[70] <u>Boyde v. California</u>, <u>494 U.S. 370, 384-85</u>, <u>110 S. Ct. 1190</u>, <u>108 L. Ed. 2d 316</u> (1990); <u>Greer v. Miller</u>, <u>483 U.S. 756, 765-66</u>, <u>107 S. Ct. 3102</u>, <u>97 L. Ed. 2d 618</u> (1987).

[71] <u>Darden v. Wainwright</u>, <u>477 U.S. 168, 181</u>, <u>106 S. Ct. 2464</u>, <u>91 L. Ed. 2d 144</u> (1986) (quoting <u>Donnelly v. DeChristoforo</u>, <u>416 U.S. 637, 643</u>, <u>94 S. Ct. 1868</u>, <u>40 L. Ed. 2d 431</u> (1974)).

[72] Petitioner's counsel noted that the Superior Court had reviewed in camera records the defense subpoenaed which included the Patton State Hospital records. (1 RT at 2).  Before Petitioner's second trial, the Superior Court again reviewed in camera Patton records before giving them to the defense.  (1 CT at 106-12 (Superior Court minutes from trial readiness hearings); 1 RT at 16-17, 21 (mentioning review).)

29

that Fuentes had additional placements and contacts with law enforcement involving violence, threats, and erratic behavior – evidence relevant to Fuentes's propensity for violence and his mental health. (1 RT at 2, 4.)  The Superior Court granted Petitioner's mistrial motion over the prosecution's objection since Petitioner's defense was based on self-defense and Fuentes's mental state at the time of the murder. (1 RT at 4.)

Before the start of the second trial, Petitioner's counsel told the Superior Court that he believed the prosecution had a police report for a juvenile case involving Fuentes, and counsel had been unable to get any juvenile records. (1 RT at 14-15.)  The juvenile court had informed Petitioner's counsel that "all of the agencies" (law enforcement who might have such records) had responded to counsel's records request, and there were no juvenile court records in existence. (1 RT at 15; 2 RT at 333.)

The prosecutor noted that Detective Munoz had produced two police reports to the prosecution:  (1) an adult report involving Fuentes using a pitchfork against a family member that the prosecutor gave to the defense; and (2) a report for a 2007 case when Fuentes was a juvenile for second degree burglary for going into a store to steal something, which was not a crime of violence and not given to the defense. (1 RT at 15-16.)  The prosecution also received from juvenile probation reports about Fuentes's placement in homes which the prosecutor could not turn over. (1 RT at 16.)  The prosecutor said the prosecution had no other police reports for Fuentes. (1 RT at 16.)

Petitioner's counsel was concerned that the Patton records noted "police action" when Fuentes was a juvenile for incidents where Fuentes stabbed his brother with a pitchfork, cut another brother's throat, and choked his mother. (1 RT at 16-17.)  The prosecutor had not provided any reports regarding these other incidents and the juvenile court had no records. (1 RT at 17.)  The Superior Court asked the prosecutor to ask law enforcement again for any related discovery. (1 RT at 17.)  The prosecutor said he had asked the police department for records relating to Fuentes stabbing his brother, and the police department said there was a 2008 mayhem case (when Fuentes was a minor) where Fuentes cut the victim's throat, but the police department did not have any records from that case. (1 RT at 17-18.)  The Superior Court urged

1  the parties to work together to find out if any additional discovery or information existed.  (1 RT

2  at 18.)

3          The prosecution later moved to exclude Fuentes's character evidence, including evidence

4  of prior acts of violence – allegedly unknown to Petitioner at the time of the stabbing – as not

5  relevant to Petitioner's state of mind.  (1 CT at 132-34; 1 RT at 30.)  Petitioner's counsel argued

6  that Petitioner knew Fuentes "from the streets" and knew of Fuentes's propensity for violence,

7  including the acts against Fuentes's family members reported in the Patton records.  (1 RT at 31.)

8  The Superior Court did not rule on the motion at the time – a ruling allowing Fuentes's character

9  evidence would come if/when the defense presented evidence that Petitioner knew of Fuentes's

10  character.  (1 RT at 31-32.)  The Superior Court warned Petitioner's counsel that if the defense

11  presented Fuentes's character evidence, the prosecution would be allowed to introduce evidence

12  of Petitioner's prior violence.  (1 RT at 32.)  Petitioner chose not to testify in his defense, so the

13  jury did not hear direct evidence that Petitioner knew of Fuentes's character.  (2 RT at 341.)

14          Fuentes's brother Victor testified that Fuentes had been admitted to Patton following a

15  "little conflict" with another one of Fuentes's brothers, and that both brothers were taken to the

16  hospital.  (1 RT at 50-51.)  Victor did not know the details regarding the conflict but said both

17  brothers were mentally ill.  (1 RT at 50-51, 53.)   Victor also did not know of any incidents

18  where Fuentes had used a knife to cut someone's throat or had choked his mother.  (1 RT at 51-

19  52.)  Victor said that Fuentes suffered from mental illness since around age 15 and was taking

20  medication.  (1 RT at 52.)  Fuentes was never violent with Victor.  (1 RT at 52.)

21          After the prosecution rested, Petitioner's counsel again noted that he had been unable to

22  obtain any of Fuentes's juvenile records.  (2 RT at 332-34.)  The prosecutor noted that he did not

23  have access to any juvenile records.  (2 RT at 334.)  The Superior Court concluded that no

24  juvenile records existed for Fuentes.  (2 RT at 335.)

25          **2.      State Court Decision**

26          The California Court of Appeal rejected Petitioner's <u>Brady</u> claim.  (Lodgment 6 at 13-

27  23.)  The Court of Appeal acknowledged that disclosure may be required even when evidence is

28  subject to a state privacy privilege, as is the case with confidential juvenile records, and

sometimes <u>Brady</u> can be satisfied by in camera review of documents containing possible exculpatory or impeachment evidence. (Lodgment 6 at 14-15 (citing California law).) The Court of Appeal concluded, however, that there was no error from nondisclosure in Petitioner's case because the Superior Court reasonably found that there was no showing that any juvenile records existed regarding Fuentes committing violent acts. (Lodgment 6 at 21.) Fuentes's available juvenile records concerning his placement in homes and burglary were not relevant and did not have to be produced. (Lodgment 6 at 21.) Regarding the 2008 mayhem incident, the Court of Appeal found that the prosecution complied with disclosure obligations – there simply were no records to produce regarding this incident. (Lodgment 6 at 21.) Any suggestion that the prosecution had and did not turn over material information about Fuentes's violent past was speculation. (Lodgment 6 at 22.)

### 3. Legal Standard

The prosecution's suppression of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[73] A <u>Brady</u> violation consists of three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[74] "[T]here is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[75]

### 4. Analysis

Petitioner has not shown a <u>Brady</u> violation from the failure to turn over Fuentes's juvenile records. The prosecutor and Petitioner's counsel made extensive efforts to discover these records only to find that no such records existed. The prosecution cannot be faulted for failing to disclose records that did not exist.

---

[73] <u>Brady</u>, <u>373 U.S. at 87</u>.

[74] <u>Strickler v. Greene</u>, <u>527 U.S. 263, 281-82</u>, <u>119 S. Ct. 1936</u>, <u>144 L. Ed. 2d 286</u> (1999).

[75] <u>Id.</u> at 281.

1    Assuming for the sake of argument that the prosecution suppressed the records Petitioner

2    sought, Petitioner can show no prejudice. If Petitioner had known about Fuentes's violent

3    history before the stabbing, it would not have changed the evidence disputing any real threat to

4    Petitioner at the time of the stabbing. Petitioner told Detective Munoz that "it wasn't much to

5    wrestle" Fuentes to the ground before stabbing him – Fuentes "went to the ground

6    automatically." (2 CT at 300.) Flores testified that Fuentes was on his knees on the ground,

7    facing away from Petitioner and trying to protect himself, while Petitioner held Fuentes's hair

8    with one hand and repeatedly stabbed Fuentes with the other hand. (1 RT at 67-69.)

9    The jury heard evidence that Fuentes had been committed to Patton, had mental health

10   problems, had been arrested before, and may have used a weapon against his brother. (1 RT at

11   50-51.) The Superior Court instructed the jury that it could consider evidence that Fuentes had

12   threatened or harmed others in the past in determining Petitioner's guilt. (2 RT at 368-69, 376-

13   77, 388; 2 CT at 194, 204). By its verdict, the jury rejected any suggestion that Petitioner's

14   conduct under the circumstances was reasonable or justifiable.

15   For these reasons, the state courts' rejection of Claim Four does not merit federal habeas

16   relief.

17   **F.    Jury Instructions**

18   In Claim Eight, Petitioner contends that the Superior Court wrongfully refused to instruct

19   the jury on the lesser included offense of involuntary manslaughter. (Pet. Att. at 32-43; Trav.

20   Memo at 16.) The involuntary manslaughter instruction applies where the evidence suggests that

21   a killing results "from a willful act committed without intent to kill and without conscious

22   disregard of the risk to human life."[76] Petitioner argues that there was a material issue about

23   whether Petitioner acted with conscious disregard of human life (*i.e.*, "whether he subjectively

24   appreciated the danger to human life his conduct posed"). (Pet. Att. at 38.) Petitioner suggests

25   he did not appreciate the danger and otherwise reacted without intent because he had "blacked

26   out," drank several beers, and had not taken his medication for his mental illness. (Pet. Att. at

27   38-39.)

28   [76] CALCRIM 580.

33

### 1. Background

The Superior Court agreed to instruct the jury on voluntary manslaughter (under theories of heat of passion and imperfect self defense) and self defense. (2 RT at 336-37, 349.) The Superior Court declined Petitioner's request for an involuntary manslaughter instruction given the evidence of malice in this case. (2 RT at 348-49.)

### 2. State Court Decision

The California Court of Appeal issued the last reasoned decision denying this claim, finding that the Superior Court had no duty to give the instruction under California law. (Lodgment 6 at 6-13.) The Court of Appeal concluded the evidence did not warrant an involuntary manslaughter instruction because the evidence "left no room for reasonable doubt that [Petitioner] acted with intent to kill or conscious disregard for human life, and he knew the risk involved to Fuentes when he violently attacked him with a knife." (Lodgment 6 at 13.) The Court of Appeal rejected Petitioner's suggestion that he was in a blackout or drunk or off his medications to interfere with his mental faculties:

> Even though [Petitioner] said his memory was blurry as to the details of the assault, there is overwhelming evidence [Petitioner] had sufficient mental faculties and malice to support his murder conviction. . . . [Petitioner's] police interview statements demonstrate that he was fully aware of what he was doing and acted with conscious disregard for the danger his actions posed to Fuentes's life. There is strong evidence [Petitioner] intentionally stabbed Fuentes because he became outraged at Fuentes when Fuentes became belligerent, threw a rock at [Petitioner's] face, and stabbed [Petitioner] in the back with a stick.

(Lodgment 6 at 12.)

### 3. Analysis

Federal habeas corpus review is available to correct violations of federal law only.[77] Any claim that the failure to give the involuntary manslaughter instruction was erroneous under

---

[77] 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 67, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

state law is not a basis for federal habeas relief.[78]  This Court may not review the Court of Appeal's finding that California law did not entitle Petitioner to the instruction in his case.[79]

Petitioner's claim is equally unavailing as a matter of federal law.  Under Ninth Circuit law, "the failure of a state court to instruct on a lesser included offense in a non-capital case does not present a federal constitutional question."[80]  An exception to this general rule may be justified in some instances, based upon a defendant's constitutional right to receive adequate jury instructions on his theory of the case where substantial evidence supports the lesser charge.[81] As the Court of Appeal explained in detail (see Lodgment 6 at 11-13), the facts in Petitioner's case did not support an involuntary manslaughter charge.[82]  As discussed in Section VI.A above, stabbing someone repeatedly (whether five times or more than 20 times) in the way Petitioner stabbed Fuentes reflects a conscious disregard for human life or intent to kill.  The Superior Court's refusal to give the involuntary manslaughter instruction did not deprive Petitioner of any constitutional right.[83]

For these reasons, the state courts' rejection of Claim Eight does not merit federal habeas relief.

///

---

[78] Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing Estelle, 502 U.S. at 67-68).

[79] See Waddington v. Sarausad, 555 U.S. 179, 192 n.5, 129 S. Ct. 823, 172 L. Ed. 2d 532 (2009) ("[W]e have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (quoting Estelle, 502 U.S. at 67-68); Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

[80] Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); see also United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases.") (citing Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), cert. denied, 534 U.S. 839 (2001)).

[81] Solis, 219 F.3d at 929.

[82] See Miller-El I, 537 U.S. at 340 (absent clear and convincing evidence to the contrary, a state court's factual finding is entitled to a presumption of correctness) (citing 28 U.S.C. § 2254(e)(1)); Menendez, 422 F.3d at 1029 (affording presumption of correctness to state court determination that evidence does not support a lesser offense instruction).

[83] See Menendez, 422 F.3d at 1029-30 (agreeing with state court's finding that evidence did not support imperfect self-defense instruction under California law and concluding that "[c]onsequently, the state court's decision was not error, let alone a violation of due process"); Solis, 219 F.3d at 929-30 (finding no constitutional error in denial of lesser included voluntary and involuntary manslaughter instructions based on agreement with state court of appeal's determination that "there was not substantial evidence to support either charge").

**G.    Eligibility for a Diversion Hearing**

In Claim Nine, Petitioner contends that the state courts' failure to provide Petitioner with a diversion hearing, as available under newly enacted (and retroactively applied) California law (Cal. Penal Code §1001.36, eff. June 27, 2018) before his conviction became final, generally violated due process, equal protection, and ex post facto principles.  Although this law passed after Petitioner's trial, Petitioner argues that if the law was applied at the time of Petitioner's trial, he would have merited a diversion hearing to consider the role his mental illness played in the commission of the charged offense (and possibly avoided criminal punishment).   (Pet. Att. at 43-49 (citing People v. Frahs); Trav. Memo at 16-17.)

**1.    State Court Decision**

The California Court of Appeal rejected Claim Nine, finding that even if the new California diversion statute applied retroactively, the California Legislature amended the statute effective January 1, 2019 (also before Petitioner's conviction became final), to state that persons charged with certain offenses, including murder, are not eligible for diversion.  (Lodgment 6 at 23-27 (citing Cal. Penal Code § 1001.36 as amended).)  The Court of Appeal found no ex post facto violation because Section 1001.36 did not exist when Petitioner murdered Fuentes, and the enactment of the murder exclusion did not change the consequences of Petitioner's crime at the time he committed the murder.  (Lodgment 6 at 26-27 (citing California law).)

The Court of Appeal explained:

> The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime. [Citation.]  Thus, "the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is criminal conduct committed before the disputed law took effect."

(Lodgment 6 at 25-26 (citing California law).)

**2.    Analysis**

To the extent Petitioner is arguing that the Superior Court erred under state law in denying Petitioner a diversion hearing, he is not entitled to federal habeas relief.  Errors of state

law are not addressable on habeas corpus.[84]  This Court must defer to the California Court of Appeal's determination on this state law issue.[85]

Petitioner's general reference to "due process" does not alter this Court's analysis.  A habeas petitioner may not "transform a state law issue into a federal one" merely by invoking general principles of federal constitutional law.[86]  Petitioner's conclusory reference to due process does not suffice to state a claim for federal habeas relief.[87]

Petitioner also has not stated a claim for federal habeas relief based on equal protection or ex post facto principles. "To prevail on [an] equal protection claim, [Petitioner] 'must [first] show that a class that is similarly situated has been treated disparately.'"[88]  Petitioner has not made such a showing here since the diversion statute (as amended before Petitioner's conviction becoming final) specifically excludes as a class all persons accused of murder from diversion hearing eligibility.[89]

For a statute to violate the ex post facto proscription, it must either (1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive one charged with a crime of any defense available according to law at the time when the act was committed.[90]  The failure to apply to Petitioner's case the new diversion statute, which did not exist at the time Petitioner murdered Fuentes, did not violate any of the foregoing principles.

For these reasons, the state courts' rejection of Claim Nine does not merit federal habeas relief.

///

---

[84] Estelle v. McGuire, 502 U.S. at 67-68.

[85] Bradshaw v. Richey, 546 U.S. at 76.

[86] Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996), cert. denied, 522 U.S. 881 (1997).

[87] See James v. Borg, 24 F.3d 20, 26 (9th Cir.), cert. denied, 513 U.S. 935 (1994) (conclusory allegations do not warrant habeas relief).

[88] Boardman v. Inslee, 978 F.3d 1092, 1117 (9th Cir. 2020), cert. denied, 142 S. Ct. 387 (2021) (citations omitted).

[89] See Cal. Penal Code § 1001.36(d)(1).

[90] See Collins v. Youngblood, 497 U.S. 37, 42, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990) (citation omitted).

**H.     Cumulative Error**

In Claim Six, Petitioner contends that the combined effect of the errors he raises in the Petition deprived him of a fair trial.  (Pet. Att. at 24-28; Trav. Memo at 13-15.)  The Superior Court denied this claim, reasoning that none of Petitioner's complaints reached the level of constitutional error justifying habeas relief.  (Lodgment 11 at 5.)

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."[91] Here, like the Superior Court, this Court has found no prejudicial error.  Thus, there is no prejudice to accumulate.[92]  Accordingly, the state courts' rejection of Claim Six does not merit federal habeas relief.

**I.     Evidentiary Hearing/Appointment of Counsel**

Petitioner has requested that this Court hold an evidentiary hearing and appoint counsel. (Pet. Att. at 50; Trav. Memo at 17.)  An evidentiary hearing is not warranted where, as here, "the record refutes the applicant's factual allegations or otherwise precludes habeas relief."[93] Petitioner's request for an evidentiary hearing therefore should be denied.

The Sixth Amendment right to counsel does not apply in habeas corpus actions.[94] Appointed counsel is not necessary in this case.[95]  This Court has: (1) construed Petitioner's pro se Petition more liberally than it would construe a petition drafted by counsel; (2) scrutinized the record independently to determine whether the state court findings were sufficient; and (3) rendered an independent legal conclusion in this case.[96] Appointed counsel would not alter this Court's recommendation.

---

[91] Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)).

[92] See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

[93] Schriro v. Landrigan, 550 U.S. 465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007).

[94] Knaubert v. Goldsmith, 791 F.2d 722, 728 (9th Cir.) (citations omitted), cert. denied, 479 U.S. 867 (1986).

[95] Id. at 730-31 ("When a district court properly declines to hold an evidentiary hearing, the court's denial of a motion to appoint counsel at government expense does not amount to denial of due process.").

[96] Id. at 729.

# VII.

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.


DATED: ___03/20/2023___

_Louise A. La Mothe_

HONORABLE LOUISE A. LA MOTHE
United States Magistrate Judge